IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| REX GATES, | ) |
| Plaintiff, | ) ) ) |
| | ) Civil Action No. 07-202 Erie |
| v. | ) ) |
| MICHAEL J. ASTRUE, Commissioner of Social Security, | ) ) ) ) |
| Defendant. | ) |

## MEMORANDUM OPINION

McLAUGHLIN, SEAN J., J.

Plaintiff, Rex Gates, commenced the instant action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), seeking judicial review of the final decision of the Commissioner of Social Security denying his claims for disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. § 401 *et seq,* and § 1381 *et seq.* Gates filed applications for DIB and SSI on February 9, 2004, alleging disability since February 6, 2002 due to a head injury, severe fatigue and weakness (Administrative Record, hereinafter "AR", 18; 234-236; 242; 411-412).[1] His applications were denied and he requested a hearing before an administrative law judge ("ALJ") (AR 213-218; 220-221; 415-419). A hearing was held before an administrative law judge ("ALJ") on November 8, 2005 (AR 420-446). Following this hearing, the ALJ found that Gates was not entitled to a period of disability, DIB or SSI under the Act (AR 18-25). His request for review by the Appeals Council was denied (AR 8-10), rendering the Commissioner's decision final under 42 U.S.C. § 405(g). The instant action challenges the ALJ's decision. Presently pending before the Court are cross-motions for summary judgment. For the reasons set forth below, we will deny both motions.

---

[1]This is Gates' second application for benefits. Gates previously filed an application for DIB on September 11, 2002 (AR 18; 57-59). This application was denied at the administrative level and by the ALJ in a decision dated May 21, 2003 (AR 18). Gates did not appeal this decision.

1

# I. Background[2]

Gates was born on February 10, 1956, and was fifty years old at the time of the hearing before the ALJ (AR 24). He is a high school graduate with additional training in nursing (AR 248; 429). His past relevant work experience was as a licensed practical nurse, and he worked part-time cleaning horse stalls in 2004 (AR 319; 430).

Historically, Gates suffered a depressed skull fracture in the right occipital region resulting from an automobile accident on February 6, 2002 (AR 107; 128). He had a history of seizures for which he took Dilantin, and Gates believed a seizure caused him to swerve into oncoming traffic (AR 114).

Skull x-rays conducted September 30, 2003 revealed a healed fracture of the right parietal bone with no other suspicious findings noted (AR 286).

Gates was seen by Lucille Kirchner, M.D., on November 19, 2003 and reported his last seizure occurred in October 2002 (AR 305). He complained of fatigue and poor exercise tolerance (AR 292). All of his lab results were reported as normal (292). He was continued on Dilantin and Keppra and scheduled for an EEG and stress test (AR 305).

Gates underwent a cardiac stress test on December 17, 2003 (AR 284-285). He was able to achieve 7 METS and a peak heart rate of 148, which represented 85 percent of the age predicted heart rate (AR 285). No significant arrhythmia was found and there was no evidence of ST segment changes or ischemia (AR 284-285).

On January 2, 2004, Gates reported that he was still tired but increasing his activity (AR 291). Dr. Kirchner reported that his blood sugar was under excellent control (AR 291). An EEG conducted January 23, 2004 revealed some focal slowing seen in the left frontotemporal region but no epileptiform[3] activity was seen (AR 307).

On July 13, 2004, Gates reported to Dr. Kirchner that he had been working at a stable

---

[2]Gates originally alleged a disability onset date of February 6, 2002 in his applications but amended this date to July 16, 2003 at the administrative hearing (AR 423). Therefore, we focus our recitation of the medical evidence on the time period from July 16, 2003 through June 20, 2006, the date of the ALJ's decision (AR 18-25).

[3]Epileptiform refers to "resembling epilepsy or its manifestations." *Dorland's Medical Dictionary* 532 (25th ed. 1974).

2

since April but his fatigue had not improved (AR 361).

On referral from Dr. Kirchner, Gates was evaluated by Barry Bittman, M.D., for his complaints of fatigue, diminished stamina and forgetfulness on August 3, 2004 (AR 327-329). He reported that he had returned to work four hours a day shoveling barns but required breaks every hour (AR 327). He reported a history of depression, stating he was currently "somewhat" depressed but had not sought mental health treatment (AR 328). On physical examination, Dr. Bittman found that Gates had a normal, non-focal neurologic examination, exhibiting 5/5 motor strength with no wasting or fasciculations, normal sensation and normal gait (AR 328). Dr. Bittman reported that his mental status was intact (AR 379). He recommended an MRI and suggested Dr. Kirchner consider referring Gates for a psychiatric evaluation with psychometric testing (AR 329). An MRI of Gates' brain conducted on September 15, 2004 was reported as normal (AR 322).

On September 21, 2004 he complained of right elbow pain and Dr. Kirchner prescribed Naprosyn (AR 361). An x-ray of Gates' right elbow was reported as normal on October 4, 2004 (AR 371). On October 14, 2004, he continued to complain of elbow pain and was referred to physical therapy (AR 360).

On October 19, 2004, Gates was evaluated by Frank Yohe, M.D., from the UPMC Behavioral Health Network (AR 349-356). Gates reported taking Zyprexa in the past which helped with mood stabilization (AR 349). He complained of fatigue, feeling "weak", dysphoria, irritability, nervousness and financial stressors (AR 349). On mental status examination, Dr. Yohe reported that Gates was cooperative, his speech was normal and goal directed, his mood was mildly depressed, his affect was full and appropriate, he exhibited no memory impairment and his judgment and insight were good (AR 346). He was assessed with recurrent major depressive disorder, assigned a Global Assessment of Functioning ("GAF") score of 60[4] and

---

[4]The GAF score considers psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness. It represents "the clinician's judgment of the individual's overall level of functioning." *See Diagnostic and Statistical Manual of Mental Disorders: DSM-IV-TR* 32 (4th ed. 2000). Scores between 51 and 60 indicate "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or

3

prescribed Zyprexa (AR 356).

On October 21, 2004, Gates was seen by Terry Hemlock, PT, for treatment of right elbow pain after injuring his right elbow while working on a gas tank underneath a car (AR 320). Gates reported that he worked cleaning horse stalls three days a week but had to rest because of fatigue (AR 320). Mr. Terry assessed him with right elbow tendinitis with associated pain and recommended physical therapy three times per week for four weeks (AR 321). He was successfully discharged from physical therapy on November 22, 2004 (AR 313). Mr. Hemlock reported that Gates' pain was significantly reduced, he was able to use his elbow more at work and home, he had 5/5 strength and his grip strength had increased to 124 pounds (AR 313).

On November 15, 2004, Gates requested Dr. Bittman complete his disability forms (AR 311). After reviewing the forms, Dr. Bittman recommended that Dr. Kirchner complete the forms as his primary care physician (AR 311).

Gates returned to Dr. Yohe on November 23, 2004 and reported he was doing "fairly well" and was trying to work around the house (AR 345). He further reported decreased irritability but no improvement in his endurance level (AR 345). On mental status examination, Dr. Yohe reported Gates' mood was euthymic, his affect was blunted, his speech was spontaneous and he had no reported symptoms of psychosis (AR 345). His diagnosis remained the same and Dr. Yohe assigned him a GAF score of 55. (AR 345). Dr. Yohe added Provigil to his medication regime (AR 345).

When seen by Dr. Yohe on January 20, 2005, Dr. Yohe reported Gates was minimally depressed (AR 344). On mental status examination, his affect was full, his speech was spontaneous, his attention/concentration was improved and his energy was fair (AR 344). Dr. Yohe assigned him a GAF score of 55 (AR 344).

On March 10, 2005, Gates returned to Dr. Yohe and reported that he performed a "little farm work" but became easily exhausted (AR 343). He further reported that the Provigil helped with his alertness (AR 343). On mental status examination, Dr. Yohe found Gates' affect was full, his speech spontaneous, he was only mildly depressed, his attention/concentration was "ok" and he exhibited poor energy (AR 343). His GAF score remained the same and he was continued

---

co-workers)." *Id.*

on his medication regime (AR 343).

On April 19, 2005, Gates reported to Dr. Kirchner that he noticed some improvement with the medication prescribed by Dr. Yohe (AR 337). He continued to report poor strength and endurance when seen by Dr. Kirchner on July 28, 2005 (AR 336).

When seen by Dr. Yohe on July 29, 2005, Gates exhibited a blunt affect, spontaneous speech and a depressed mood (AR 342). Dr. Yohe found he had "ok" attention/concentration and "fair" energy (AR 342). Since he complained of increased depression, Dr. Yohe increased his Zyprexa dosage (AR 342). He was assigned a GAF score of 55 (AR 342).

On August 16, 2005, Gates underwent a Physical Work Performance Evaluation conducted by Vikki A. Zook, OTR/L (AR 333-334). The evaluation consisted of thirty-six tasks to assess dynamic strength, position tolerance, mobility and fine motor skills (AR 333). Based upon Gates' performance, Ms. Zook indicated that he was capable of performing work at the medium level for less than two hours per day, "ramping up" to an eight-hour day as tolerated (AR 333). Alternatively, he could "likely" tolerate an eight-hour day performing work at the light exertional level (AR 333). Ms. Zook reported that Gates had the ability to, *inter alia*, lift over twenty pounds, sit constantly and walk and stand frequently (AR 335). Ms. Zook was of the opinion that Gates would benefit from a conditioning program (AR 334).

Gates was seen by Michael Mercatoris, Ph.D on October 28, 2005 (AR 399-403). Gates reported that he had been depressed off and on for the previous year (AR 402). He further reported increased fatigue, and that Dr. Kirchner was of the opinion his fatigue was due to depression (AR 402). Gates however, reportedly felt his depression was secondary to his decreased functioning (AR 402).

On October 30, 2005, Virginia Kraft, Gates' supervisor, completed a Questionnaire relative to Gates' employment (AR 280-282). Ms. Kraft stated that Gates worked at "half speed," required frequent breaks and only worked a three day "week" because he needed days off to "recover" (AR 280-281). Ms. Kraft stated that Gates was dependable, but "apparently due to illness [was] limited in his physical ability" (AR 281).

Finally, on January 17, 2006 and March 8, 2006, Michael Schwabenbauer, Ph.D., performed a neuropsychological evaluation of Gates (AR 406-410). Dr. Schwabenbauer reported

5

that Gates was able to walk independently with the use of a cane and able to relate the events of his automobile accident in a logical and coherent manner (AR 407). Gates reported that following the accident, he noticed difficulty with generalized weakness and reduced cognitive endurance (AR 407). He reported that he was easily distracted and suffered from occasional headaches, particularly when he tried to maintain concentration (AR 407). He claimed he was unable to return to work and resorted to working various odd jobs to maintain income (AR 407). Dr. Schwabenbauer reported Gates' mood appeared mildly dysphoric, with a restricted range of affect evident, but he was "quite pleasant and talkative throughout" and responded to all questions posed (AR 407).

Dr. Schwabenbauer reported that Gates had a mild degree of cognitive dysfunction noted by slowed processing and mild compromise on selected verbal recall tasks (AR 409). He noted that the test findings were consistent with numerous somatic complaints consistent with those frequently seen following a mild closed head injury, as well as significant depressive symptomatology (AR 409). Dr. Schwabenbauer found that, in contrast to the preceding findings, Gates' verbal reasoning skills, language and visual perceptual processing fell within expected limits and his general vocabulary, immediate recall, story recall and delayed recall of visual information fell within the high-average or superior range (AR 408-409). Dr. Schwabenbauer stated that Gates' diagnosis "appear[ed] consistent with that of post-concussive syndrome" (AR 409). Based upon his findings, Dr. Schwabenbauer recommended Gates consider a trial of a cholinesterase inhibitor, a follow-up trial of cognitive rehabilitation and continued mental health treatment for depression and anxiety (AR 409-410).

Gates and Joseph Kuhar, a vocational expert, testified at the administrative hearing held by the ALJ on November 8, 2005 (AR 420-446). Gates testified that he attempted to continue working after his disability onset date on a part-time basis, which lasted for approximately one year (AR 429-430). Gates testified that he cleaned stalls for approximately twelve hours per week in order to gain strength, but had to rest for fifteen minutes every hour during his shift and his stamina did not improve (AR 430-431). He claimed during his days off he was exhausted and unable to function (AR 432). Gates testified that his last seizure occurred in October 2002 and he had recently regained his driver's license (AR 432). He was compliant with his seizure

6

medication but it caused fatigue (AR 433). Gates testified that he suffered from depression which caused sadness and concentration difficulties (AR 436). He testified that his diabetes was under fair control (AR 437). Gates claimed he suffered from headaches approximately four times per week for which he took Motrin and would lie down for several hours (AR 440).

Gates testified that he was able to bath and dress himself and do several loads of laundry per week (AR 438-439). He was able to cook meals occasionally, but was unable to stand at the stove (AR 438). He no longer fished because he was unable to walk to the creek, but was able to accompany his boys hunting on horseback for approximately one hour (AR 438-439). He claimed he did not socialize and spent most of his day resting while trying to complete activities (AR 439-440). Gates testified that due to fatigue, he was only able to stand for several minutes before needing to sit down (AR 440).

The ALJ asked the vocational expert to assume an individual of the same age, education and work experience as Gates, who was limited to light work activity that did not involve heights, dangerous machinery, climbing or balancing (AR 4410442). The vocational expert testified that such an individual could perform the following light jobs: mold cleaner; hand packer in the food industry; and mail clerk (AR 442). The vocational expert further testified that such an individual could perform the following sedentary jobs, with a sit/stand option: sorter in the food industry; routing clerk and surveillance system monitor (AR 442-443). The vocational expert further testified that added limitations of being absent from work on an irregular basis, being off task ten to fifteen percent of the workday and/or requiring a fifteen minute rest period for every hour worked eliminated the jobs identified (AR 443-444).

Following the hearing, the ALJ issued a written decision finding Gates was not entitled to a period of disability, DIB or SSI within the meaning of the Social Security Act (AR 18-25). His request for an appeal with the Appeals Council was denied rendering the ALJ's decision the final decision of the Commissioner (AR 8-10). He subsequently filed this action.

## II. STANDARD OF REVIEW

The Court must affirm the determination of the Commissioner unless it is not supported by substantial evidence. *See* 42 U.S.C. § 405(g). Substantial evidence does not mean a large or considerable amount of evidence, but only "such relevant evidence as a reasonable mind might

7

accept as adequate to support a conclusion." *Pierce v. Underwood,* 487 U.S. 552, 564-65 (1988) (quoting *Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229 (1938)); *see Richardson v. Parales,* 402 U.S. 389, 401 (1971). It has been defined as less than a preponderance of evidence but more than a mere scintilla. *See Richardson,* 402 U.S. at 401; *Jesurum v. Secretary of the United States Dept. of Health and Human Servs.,* 48 F.3d 114, 117 (3d Cir. 1995).

### III. DISCUSSION

Title II of the Social Security Act provides for the payment of disability insurance benefits to those who have contributed to the program and who have become so disabled that they are unable to engage in any substantial gainful activity. 42 U.S.C. § 423(d)(1)(A). Title XVI of the Act establishes that SSI benefits are payable to those individuals who are similarly disabled and whose income and resources fall below designated levels. 42 U.S.C. § 1382(a). A person who does not have insured status under Title II may nevertheless receive benefits under Title XVI. *Compare* 42 U.S.C. § 423(a)(1) *with* 42 U.S.C. § 1382(a). In order to be entitled to DIB under Title II, a claimant must additionally establish that his disability existed before the expiration of his insured status. 42 U.S.C. § 423(a), (c). The ALJ found that Gates met the disability insured status requirements of the Act as of the date of his decision (AR 20). SSI does not have an insured status requirement.

To be eligible for DIB or SSI, the burden is on the claimant to show that he has a medically determinable physical or mental impairment (or a combination of such impairments) which is so severe that he is unable to pursue substantial gainful employment currently existing in the national economy. 42 U.S.C. § 423(d)(1)(A) and (d)(2)(A). The Commissioner uses a five-step sequential evaluation process to determine whether a person is disabled. *Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987). The process requires the Commissioner to consider, in sequence, whether a claimant: (1) is currently employed; (2) has a severe impairment; (3) has an impairment which meets or equals the requirements of a listed impairment; (4) can perform past relevant work; and (5) if not, whether the claimant is able to perform other work, in view of his age, education, and work experience. 20 C.F.R. §§ 404.1520, 416.920(b)-(f); *Ferguson v. Schweiker*, 765 F.2d 31, 37 (3rd Cir. 1985).

Here, the ALJ determined that Gates' history of head injury and seizure disorder were

8

severe impairments, but determined at step three that he did not meet a listing (AR 21-22). Despite his impairments, the ALJ found that he could perform light work involving no heights, dangerous machinery, balancing or climbing (AR 22). The ALJ concluded that he could perform the light and sedentary jobs cited by the vocational expert at the administrative hearing (AR 24-25). The ALJ also concluded that Gates' statements concerning the intensity, duration and limiting effects of his symptoms were not entirely credible (AR 22). Again, we must affirm this determination unless it is not supported by substantial evidence. *See* 42 U.S.C. § 405(g). Although Gates sets forth several errors allegedly committed by the ALJ, we shall examine his challenge to the ALJ's credibility determination since it is dispositive in this case.[5]

In evaluating a claimant's credibility, an ALJ must consider subjective complaints by the claimant and evaluate the extent to which those complaints are supported or contradicted by the objective medical evidence and other evidence in the record. 20 C.F.R. § 404.1529(a). Subjective complaints must be seriously considered, whether or not they are fully confirmed by the objective medical evidence. *See Smith v. Califano*, 637 F.2d 968 (3rd Cir. 1981). The ALJ as the finder of fact can reject, partially or fully, subjective complaints if he finds them not credible based on other evidence in the record. *Baerga v. Richardson,* 500 F.2d 309, 312 (3rd Cir. 1974). The ALJ is empowered to evaluate the credibility of witnesses and his determination is entitled to deference by this Court. *See Van Horn v. Schweiker*, 717 F2d 871, 873 (3rd Cir. 1983). Here, the ALJ found that Gates' "statements concerning the intensity, duration and limiting effects of [his] symptoms are not entirely credible" (AR 22). In reaching this conclusion, the ALJ relied in part on the medical records, concluding that the findings therein were inconsistent with Gates' contention that he was suffering from a debilitating mental or physical condition (AR 22-23). The ALJ also relied on Gates' ability to perform a wide range of daily activities, as well as his ability to maintain a part-time job (AR 22-23).

Gates argues that the ALJ erred in failing to consider his long and productive work history in assessing his credibility. *Plaintiff's Brief* p. 14-15. Testimony regarding subjective

---

[5]Gates also challenges the ALJ's residual functional capacity ("RFC") assessment and his reliance on the vocational expert's testimony. Since we have determined that a remand is appropriate for the reasons discussed above, we need not address these arguments inasmuch as the ALJ will necessarily re-evaluate Gates' RFC in the course of reconsidering his credibility.

9

complaints from a claimant with a long work record is entitled to substantial credibility. *See Dobrowolsky v. Califano*, 606 F.2d 403, 409 (3rd Cir 1979) (claimant's testimony as to his capabilities entitled to substantial credibility due to continuous work history); *Taybron v. Harris*, 667 F.2d 412, 415 n.6 (3rd Cir. 1981) ("when the claimant has worked for a long period of time, his testimony about his work capabilities should be accorded substantial weight"); *Podeworney v. Harris*, 745 F.2d 210, 217 (3rd Cir. 1984) (claimant's testimony entitled to substantial weight since it was unlikely he would have quit a job at which he was working for 32 years); *Walker v. Sullivan*, 1991 WL 125172 at *5 (E.D.Pa. 1991) (ALJ should have given claimant's testimony "far more deference" due to his continuous long work history, in addition to returning to work after injury).

Gates previously worked for approximately 17 years as a licensed practical nurse, from 1985 until February 2002, when he ceased work due to his alleged impairments (AR 65-66; 96; 379; 429; 441). The Commissioner contends that the ALJ "clearly considered" this history because he "recognized" Gates' previous job as a licensed practical nurse and that he continued to work part-time during the period at issue. *Defendant's Brief* p. 14. The ALJ's decision however, contains only a statement that Gates previously worked as a licensed practical nurse, and this observation was made in connection with his vocational analysis and not his credibility assessment (AR 24). *See e.g., Reider v. Apfel*, 115 F. Supp. 2d 496, 507 (M.D.Pa. 2000) (finding that ALJ failed to properly address claimant's work history and post-accident unsuccessful work attempts); *Sidberry v. Bowen*, 662 F. Supp. 2d 1037, 1039-40 (E.D.Pa. 1986) (ALJ erred in ignoring claimant's work history and efforts to hold down a job). We are therefore of the opinion that a remand is appropriate in order for the ALJ to re-evaluate Gates' credibility in light of his long work history. *See Weber v. Massanari*, 156 F. Supp. 2d 475, 486 (E.D.Pa. 2001) (case remanded for ALJ to reevaluate claimant's credibility in connection with his long work history); *Bazemore v. Heckler*, 595 F. Supp. 682, 688 (D.Del. 1984) (case remanded to the ALJ since there was no indication in the record that the ALJ considered the claimant's long work history in his credibility assessment); *Taylor v. Shalala*, 1994 WL 111376 at *6 (E.D.Pa. 1994) (case remanded because, in rejecting claimant's complaints, the ALJ did not specify that while he accorded claimant's testimony great weight due to his long work history, he still believed that he

exaggerated his claim).

## IV. Conclusion

Based upon the foregoing reasons, Gates' motion for summary judgment shall be denied and the Commissioner's motion for summary judgment shall be denied. The matter shall be remanded to the Commissioner for further proceedings consistent with this Memorandum Opinion. An appropriate Order follows.

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| REX GATES, | ) |
| | ) |
| Plaintiff, | ) |
| | ) Civil Action No. 07-202 Erie |
| v. | ) |
| | ) |
| MICHAEL J. ASTRUE, | ) |
| Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

# ORDER

AND NOW, this 14th day of April, 2008, and for the reasons set forth in the accompanying Memorandum Opinion,

IT IS HEREBY ORDERED that Plaintiff's Motion for Summary Judgment [Doc. No. 14] is DENIED and Defendant's Motion for Summary Judgment [Doc. No. 19] is DENIED. The case is hereby REMANDED to the Commissioner of Social Security for further proceedings consistent with the accompanying Memorandum Opinion.

The clerk is hereby directed to mark the case closed.

s/ Sean J. McLaughlin
United States District Judge

cm: All parties of record.